James Thompson, on behalf of Appellant Petitioner David Fierro, there are three issues that were raised with respect to the Certificate of Appealability in the case, and they're really all kind of related. I want to go to the last claim that's raised in the briefing, and that's the ineffective assistance of counsel for failure to investigate and to present a mental state defense. And then, depending upon what time is available, I may turn to the other two claims, which involve ineffective assistance of counsel for failure to pursue competency, and then the fact that Mr. Fierro was incompetent at the time of trial, independent. I would like to reserve three minutes for rebuttal, and I will monitor the clock. In this case, trial counsel who admitted that he erred in failing to pursue a mental state defense really did nothing in that regard. While there was a doctor that was appointed for the purposes of evaluation of competency, there was no pursuit whatsoever with respect to the hiring of any mental health experts, or even the evaluation of any of the records that were in the possession of trial counsel that were provided in discovery, which included Mr. Fierro's school records, Mr. Fierro's psychological records from the school at that time. Could you take a step back, because I found this argument very confusing. What was the purpose, what would have been the purpose of the mental state defense in the context of this particular trial and what he was attempting to accomplish with it, had it been made? Had he pursued a mental state defense, and so someone such as Dr. Jackman, who provided a declaration in this case, he would have provided testimony that Mr. Fierro did not have the intent to kill. No, he could have been the shooter and still not had an intent to kill. So he was the shooter. So say the jury found in the special verdict form that he was the shooter. No, there was evidence there were two shots. And so he shot Mr. Alessi, so to say, that the jury is finding, but he didn't have the intent. So what does that mean? Well, he didn't have the intent to kill, which because this case was tried during what's referred to as the Carlos window, that time in which the jury was actually required to make a determination that a special circumstance of there being an intent to kill, Mr. Fierro would not have been convicted of a special circumstance. And so what's the reasoning? I'm just having trouble understanding that. There were two shots. He was shot in the head, and he didn't have the intent to kill. So how did those two things fit together? I'm not understanding. Like he didn't know right from wrong? It's sort of like a McNaughton type defense? Well, Doctor, I guess there's two points there. One, the factual premise that the court is talking about here, if we go down that path, is refuted by the other claims that we raised with respect to the fact that the pathologist in this case' testimony was invalid. And we had two... But I still don't... I mean, the jury said he was the shooter and there were two shots, and the pathologists were just arguing about which order were the shots, which I'm just not sure how that makes a difference. That meant as to whether or not it was, quote, an execution-style killing or not. Does that matter? I mean, he shot him twice, once in the head. Does it matter which order it is for purposes of the shooting? It would, given the arguments that were made in the case in terms of... Explain to me how that would work if he's the shooter and how an intent to kill would even fit in there. I'll go to Dr. Jackman's testimony. Dr. Jackman's testimony was the fact that at the time of the shooting, at the time of the crime, that Mr. Fierro was in an altered state of consciousness, which parallels the case of Jennings v. Woodford. This case almost runs exactly like the Jennings case in terms of the testimony that was provided, in terms of the degree of the act of the individual. In Mr. Jennings' case, he actually killed two individuals, and the crimes were much more intentional, if you will. There were some rules at the time about what an expert could testify about diminished capacity, that that was no longer allowed. I'm not sure I understand what diminished actuality means, but wouldn't any expert have been very... In other words, they couldn't have testified that he didn't know what he was doing or that he didn't know right from wrong or that. So what could they have testified to? But that's an insanity defense, and that's not what we're talking about. What we're talking about is he did not have the intent to kill. So he shot him in the head but didn't have the intent to kill? I'm just having so much trouble understanding that. Well, as I said, because of Mr. Fierro's intellectual disability, because of the fact that he was intoxicated at the time on heroin and had drank two bottles of wine that day, because of the other medications, because of the other factors in his background with respect to post-traumatic stress disorder and other things, Dr. Jackman comes up with, after his psychiatric evaluation and after the neuropsychological evaluation by Dr. Fromming, that he did not have the intent to kill. That is, he was in an altered state of consciousness at the time of the shooting. So regardless of whether he was shot in the head or regardless of whether he was shot in the heart or some other place, he did not have, at that point in time, the intent to kill. Now, diminished capacity was... But what intent did he have? He had the intent to rob, and that would provide a felony murder for first-degree murder. But he did not have the intent for special circumstances. Can I interject for just a minute because it may or may make a difference? I thought both shots were to the chest. I don't recall a shot to the head either. Well, I'm reading the magistrate judge report, and as I recall, Hunter said the same thing. They were both to the chest. Yes. It may or may not make a difference because the witnesses say execution style. That is to say that when the victim was on the ground, whoever the shooter was leaned over to him, put the gun to him, and shot him execution style. So it may or may not make a difference whether it's head or chest, but I wanted to make sure. I agree, and I wasn't trying to correct the court. I just was going along with it. It doesn't matter where the shot was to some extent. It may. I mean, execution style to the head, that's a guarantee you're going to kill him. Yes. Execution style to the chest, there's a pretty good chance you're going to kill him. And the question as to whether or not there was the first shot fired execution style or not gets into the discussion. It's not a COA issue about the pathology. I've got a different question. The defense proffered at trial was not I was the shooter, but I did not have an intent to kill. The defense offered at trial was I didn't do it. Yes, it was an alibi. And that was the defense. Well, they didn't even give an alibi in the sense I was somewhere else. He just says I didn't do it. And Mr. Morris presented that defense at the insistence of Mr. Fierro. Now, you can't really give both defenses. And so long as Mr. Fierro is insisting that the defense be I didn't do it, how is it ineffective assistance of counsel to fail to present a defense of yes, I did it, but I didn't have the intent to kill? That's what Jennings deals with directly. Because Mozingo, decided by the California Supreme Court in 1983 prior to this trial, says that it doesn't matter whether a defendant wants a particular defense or not. You have a duty to investigate whether or not there is a mental state defense. And then you have a duty to present that to the defendant. And then at that point in time, some decision can be made. But you still have the duty. And in Jennings, the court specifically held that because of the standard of care that Mozingo provides, Jennings, which parallels this case almost to a T, and the other cases that are cited in there, I think it's Bloom and Seidel, that under these circumstances, counsel had a duty to investigate and present a mental state defense. Now, if I'm in Mr. Morris's position, I'm really between a rock and a hard spot on this one. I think the defense is going to be hard to sustain if the defense is I wasn't there. But if you have eyewitness testimony as to whoever the shooter was, that he shot once, the victim, Sam, falls to the ground. After he's on the ground, the shooter leans over and basically, with the muzzle of the gun against the victim, shoots him again. To convince a jury that there was no intent to kill, boy, that's a tough one. But that's exactly the fact pattern, except that there were more individuals that were harmed in Jennings. And this court overruled the conviction, and it was upheld by the district court, because of the fact that there was a failure to investigate the mental state defense. So that's the segue for my question. Are you saying that a defense lawyer has an obligation in every case to conduct such an examination? Because in this case, there wasn't evidence that the lawyer had, that there was a need for an examination, that he seemed to be functioning. In fact, Mr. Morris was in the trick bag in another way, too, because the relationship with the client was so wobbly. He'd been through three lawyers, and he finally got to Mr. Morris, and the defendant was unhappy half the time and satisfied the other half. So he was having to cue the line of the defense that the defendant wanted. He had an obligation to do that. But as I read the record, there wasn't the kind of evidence that would cause a reasonable defense lawyer, at least an effective defense lawyer, to say, my goodness, we have a mental capacity problem in the facts of this case. So if there's no evidence coming into the trial that that's warranted, are you saying there's still a duty to do that? No, but there's plenty of evidence. This case was full of evidence that alerted Mr. Morris, which is why when we showed Mr. Morris the records that he had received from the district attorney in discovery, he said and signed a declaration saying, you're correct, I should have reviewed those documents. I didn't review those documents, and those documents alerted me to the fact that I should have pursued that defense. The two other counsel that represented Mr. Fiero before Mr. Morris both told Mr. Morris that one, Mr. Fiero is very slow, and two, you must hire a mental health expert to evaluate the defendant. And he did, didn't he? No, no, he did not. He hired Mr. Hamed? No, he did not. He hired Mr. Hamed for the purpose, Dr. Hamed, for the purpose solely to determine competency. He did not in any way ask him or give him any of the records that Mr. Morris had in his possession. Those records showed that he was intellectually disabled, that he had three different psychological reports that were contained in the school records that showed that he could not function cognitively, that he was slow educationally wise and slow mentally, and that there was use drugs that were found in the car at the time of the arrest. Mr. Fiero was addicted to drugs at the time that Mr. Fiero drank two bottles of wine that day, was high on heroin that day, was going through withdrawal. But had enough intent to do the robbery. But robbery is just, yes, is asking for money. So whatever his competency level was, he was competent enough to have the intent to do the robbery, but not the murder. His capacity was such that he had the ability to form the intent to do the robbery. He did not have the capacity to form the intent to commit a special circumstance, to intent to kill. And that triggers the different stuff. So there's all that. Although given that the death penalty is off the table, the special circumstance is also, in a sense, off the table. No. Well, it is and it isn't. I mean, he's now got LWOP instead of 25 to life. Well, that's the difference between seeing daylight and not. Well, in California, I think there is no difference between LWOP and 25 to life, given the nature of this crime. But I understand what you're saying. This is a single homicide that was committed during the course of a felony robbery. This is not the facts and circumstances that are outlined in the Jennings case, or in the other cases that Jennings cites. I must just continue to say Jennings controls this outcome. It's this circuit's case. And it controls because the parallels are the same, such that even the doctor that eventually testifies in Jennings' evidentiary hearing talks about the invalidity of the same type of competency examination that Dr. Ahmed gave, two-hour interview versus a four-day interview that was conducted by Dr. Coleman. Your later evaluations were extensive. You're down to 45 seconds or so. I will reserve the rest. Okay. And we'll give you a chance to say what you need to say in rebuttal. Thank you. Good morning, Your Honor. May it please the Court. I'm Kevin Viena, California Deputy Attorney General, for appellee and respondent in this matter. If the Court desires, I will turn and discuss mostly issue number three, because that's where opposing counsel has ably briefed and presented his argument in this case. But in this case, the critical matter is this. Is there any chance that a jury who sees Mr. Fierro as having the mental capacity to commit a robbery, and he behaved in a way that showed knowing awareness of the circumstances of the robbery, that is, he got the keys to the car. It's not very clear, but it is inferrable that he knew that Mrs. Alessi had the money and she kept it in her purse because he tries to enter the driver's side door with the keys. He's unsuccessful. He goes around to the passenger side's door. He demands the money from Mrs. Alessi. She hands him the money, and it looks like that's about $1,000 in cash. But there's also a number of checks and some other materials in her purse. He grabs the purse and leaves. So he's demonstrated a pretty good awareness of the circumstances. He goes to the back of the car, and I know opposing counsel has argued that it's not clear that Mr. Fierro was the shooter. The jury certainly found that to be clear, that he was the shooter in the case. The strong evidence from the witnesses is that he was the shooter in the case. That is, he was dressed like the shooter, and Ms. DiCenzo seemed to recognize him as the shooter. His behavior in the shooting showed an awareness of the circumstances, that is, he's got a gun, he's engaged in a robbery, he's doing away with the only opposition to the robbery, and both of the shots are fatal, even if both in the chest. Both are fatal. California law reasonably, or California courts reasonably, have expressed that you can infer intent to kill from the nature of the killing, that is, the weapon, a gun, close range, location of the shots. Number of the shots. And location, number and location of the shots. I would add that I would agree that the number of shots seems to emphasize his intention was to kill. There was certainly no reason to shoot a second time. Well, he'd already immobilized him with the first shot. Yes, Your Honor. That probably killed him with the first shot, though perhaps not immediately. Well, in terms of what he knew, he knew he'd immobilized him. Yes, Your Honor. So there simply was little likelihood of finding no intent to kill. Now, Dr. Jackman says, actually, I read Dr. Jackman as saying that he was insane at the time of the trial, not simply that, or insane at the time of the crime, not simply that he couldn't form the intent to kill. I think he reaches both of those conclusions in 1993, when Mr. Farrell was still facing the death penalty. But the factual basis for his claim, as I've tried to indicate, is not very well developed. That is, we have to guess what Mr. Farrell has told Dr. Jackman, Dr. Fromming, and the social worker, about his behavior on the day of the crime. That is, that he consumed a great deal of wine, that he was high or withdrawing from heroin administration. That seems to be pure speculation from the record, so far as I can see it. That is, on the other hand, what the record does show clearly is that shortly after the, well, a few months after the crime, he talks to Dr. Hamed, and he says to Dr. Hamed, yes, I've used heroin since I was 15 years old, but infrequently, and I was never addicted. And there's every reason to believe that he told his lawyer the exact same thing at the same time, or that the lawyer had no other information regarding drug use on the day of the crime, other than what Mr. Farrell had told to Dr. Hamed. In that circumstance, it is a stretch to say that the defense counsel should have presented a defense of inability to form the intent to kill. It was a weak defense. It was inconsistent with the desired defense of the defense counsel, and it was inconsistent with what Farrell had told Dr. Hamed earlier. The opposing counsel said that when Mr. Morris was presented with the evidence, the indicia of lack of ability to form the intent, that Mr. Morris conceded that he should have had that theory developed or better developed. How do you respond to that? That you've got sort of an admission against interest by the lawyer in an effective assistance case. We can see that Mr. Morris was troubled by the outcome in this case from his discussions with the trial judge, both before the sentencing phase began and afterwards. But Mr. Morris also can be seen to have wanted to bend over hard to help his client avoid the death penalty. He said in that same declaration eight years later that his client was incompetent to stand trial because he was unable to cooperate with his lawyer. Twice in the record, however, Mr. Morris told the trial judge that, I'm doing okay with this client. He is cooperating with me. We're discussing things. I would have preferred that he would allow me to have used a slightly different defense. That is, I think he wanted his client to get on the witness stand and say, yes, I was part of this robbery, but I was not the shooter and I didn't intend anyone to die. Because of existing California law at the time, the Frierson case, he was unable to do that. And he was practically unable to do it as well because in order to do that, Mr. Fierro would have had to admit guilt of something that he has simply never done, never admitted guilt. In those circumstances, it is well. You mean admitted guilt to something that he maintained he had never done? He's never admitted guilt for the robbery, for any of it. Now, so the explanation for Mr. Morris falling on his sword about wishing he had done things differently, that's not unusual. We see that. Can I address the question that was not addressed during the argument? It's clearly there in the briefs, though, and that's competency to stand trial. Dr. Jackman concludes unequivocally that he was incompetent to stand trial. Dr. Hammond differs. Dr. Hammond's examination, as we know, really consisted of only a two-hour interview. The guy's clearly slow. We get fairly well established. I don't think the state challenges that he's got a low IQ. The numbers range in the 70s to low 80s. Lower than that, I would say, Your Honor, 60s to high 70s, perhaps. Fair enough. Somebody with that degree of mental capacity is going to have trouble giving any real assistance to the lawyer. And, in fact, he's going to mess up the lawyer because he's going to insist upon saying, I wasn't there, when the evidence that he was there is fairly strong, including the fact that his wife has the victim's wallet. So that's an idiotic thing for someone to insist upon. So I've got trouble thinking that he was, in fact, competent to assist in his own defense. Well, let's say that's true. Just let me augment the question, if I may. Please. So let's say that's true, that he's giving evidence of being incompetent to assist in his defense. What is the defense lawyer supposed to do under that circumstance beyond what Mr. Morris did, and that is get the opinion and get an exam and try to work with the guy? Well, I think Mr. Morris did what was appropriate in the circumstance, although I would ---- My question is, this one is actually not directed so much to Morris, but directed to the actual incompetency. Yes, Your Honor. This case is troubling because of the intellectual disability aspect of it, without question. I think it bothers all of us that we've got that problem. It should bother people, and that's, in essence, the reason for Atkins, that is the desire to be very careful to avoid the wrongful imposition of the death penalty. So we have Atkins that applies there. But Atkins also says that an individual can be intellectually disabled and competent to stand trials. Atkins says frequently. That's not necessarily true because if there was an Atkins defense, that means that anybody who's that disabled intellectually is never guilty because you can't assist in your trial. You can never try them. Yeah, I got that. So the question is, was he able to cooperate and assist? And the fact his insistence looks difficult, but no one has suggested so far as I can see that he had a delusional problem, that his mental problem was one of delusion or the fixation of a. . . Well, he was not delusional in the sense of, you know, the CIA is talking to me through the fillings in my teeth. Yeah. But he was delusional in the sense that the defense he wanted was going to do him any damn good. Was unrealistic. Yeah. And my best response to that, I think, Your Honor, the best one I can give is that he was with three defense lawyers over the course of the prosecution, three different defense lawyers. Not one of them then expressed a doubt as to his competence. Mr. Morris had what appeared to be an acute or to observe an acute circumstance when he said Mr. Farrell seemed to be more distrustful and was behaving in an unusual way. That's not described further in the Morris Declaration. But that's an acute circumstance that happened after he had been seeing him for several months or he'd been his lawyer for several months. And then he said I better get, I have a suspicion, not a doubt, but a suspicion, and he investigated the suspicion. We have three lawyers who at the time never expressed a doubt. And never expressed a doubt. Lawyers who are, I think, deemed to understand and recognize the problems of competence. And we have a ---- I'm not quite sure. Let me overstate it somewhat because I gather that both of the two earlier lawyers had told Mr. Morris that you should get some mental evaluation, and Mr. Morris kind of did and kind of didn't. He didn't do a very good job. He did not equip Dr. Hammond to do a proper investigation, it seems. I agree with the court's observation that Mr. Morris didn't do everything he was asked to do. I think factually only Mr. Shereff asked him to or suggested that he get an evaluation. And this would be a different circumstance, I believe, if I were here defending the death penalty and arguing that Mr. Morris's preparation for a mitigation trial was adequate. But I think his preparation on the question of competence was adequate. But if I could add, not only did not any of those three lawyers at the time express a doubt as to competence, but in their declarations eight years later, when they had every motive to do what Mr. Morris did, and that is second-guess their behavior in the trial, not one of them says that they suspected a problem with competence. When the problems are, well, let me start this question differently. It's often obvious to the trial judge whether there's a competency issue. So was there anything in the record here that showed that it caught the attention of the trial judge and was addressed? There was no bizarre behavior. There's no bizarre behavior in the record. There is, on the other hand, a record of three pretty strong interactions between this defendant and the judge. Mr. Farrell was engaged in three Marsden motions, during which the judge had a chance to question him about why he wanted a different lawyer. And what he saw was that Mr. Farrell was distrustful of the public defender's office because, as the judge admitted, he'd been done wrong. That is, he had quickly cycled through three separate public defenders, and that gave rise to his concern and his cause for distrust. But in each of those Marsden motions, the hearings conducted with them, Mr. Farrell clearly was able to describe his desire. I want a different lawyer, and clearly able to say, I want a private lawyer. I don't want someone from the public defender's office. He said, I don't want somebody paid for by the state. Exactly, Your Honor. Not understanding he was paid for by the county, but that's a nuance. Yes, and the state would have paid for his private lawyer as well. But there was plenty of interaction, and then he testified at trial. Mr. Farrell testified at trial, and he explained a number of things. He was a loving father. He wanted to help his wife raise their daughters. The record shows. He made the decisions about not calling them, although he wound up calling them at his death penalty hearing, right? Yes, just there was a Marsden discussion before the penalty phase began. The penalty phase. Yes, Your Honor. And at that discussion, Mr. Moore said he doesn't want to present any mitigating evidence because he doesn't want to burden his family, which doesn't seem to me to be irrational. But he changed his mind, and eventually his family members did testify. So it is difficult. No doubt he was slow. There can be no question that he was slow. But if there's a difference between being slow and being incompetent, Mr. Farrell looks like one of those individuals, one of those many individuals who could have been, who was, in fact, intellectually disabled but competent to stand trial. Okay. Thank you. Thank you, Your Honor. Now you sought to reserve, I think, three minutes. Yes, Your Honor. Let's put three minutes on the clock. I have three things I want to talk about very quickly. One is with respect to the competency issue. Both procedural due process and substantive due process. Procedural is whether the court was alert to the facts of that. That is not as strong, nearly, as the substantive due process. Substantive due process is based upon a lifelong intellectual disability, neurological impairments, anxiety disorder, post-traumatic stress disorder, substance addiction, language difficulties. At the Atkins hearings, the Riverside Superior Court found that Mr. Farrell had, at that point in time, the education equivalency of 11-year-old. At the time of the event? I mean the offense? No, in his life. Okay. Okay. I'm trying to probe whether you're talking about his intent at the time of the event. No, no, this is competency. This is pure competency. Paranoid distrust of lawyers and was taking psychotropic medications, Visitrol and Xanax, during the course of trial. None of that was known by Mr. Morris. Mr. Morris should have raised those issues with Dr. Hamed. He did not. Dr. Hamed came back with a report based on a two-hour interview, said that he was competent. He did not have that information. In the declaration, trial counsel did. And I take offense to this falling on his sword. Mr. Morris was a respected public defender in Riverside County that had tried cases in that county for some 30 years. He recognized that due to the difficulties in the case and the shifting of lawyers and that him finally getting on in this case, and he admitted his caseload was such that he was not able to devote his time to this case, that he then, when we presented him that evidence, he felt horrible about what had happened. And then he wrote, not falling on his sword, but telling the truth. The status of the case investigation did not afford me the opportunity to provide Dr. Hamed with records that I would normally want reviewed by a mental health professional. I did not have in my possession any custody records, including records from the Riverside County Jail, employment records, juvenile court records, or the multitude of documents that an attorney should assemble in preparation for a penalty phase. Nor did I provide Dr. Hamed with Mr. Fierro's school records, law enforcement reports regarding Mr. Fierro's drug use, or the court records from versus Fierro that I possessed. Maybe it was Dr. Hamed that was ineffective. We're not challenging that. I think that that's a different issue. He says why he didn't do it. But in the end, he says, in formulating the defense at trial, I did not consult any mental health professionals for the purpose of ascertaining Mr. Fierro's mental state at the time of the crime. I was aware that Mr. Fierro had a history of drug abuse, but I did not undertake any investigation to determine whether his drug use on the day of the crime affected his ability to form the mental states for the charged crimes. My failure to present a mental health defense at trial was not a tactical and informed decision. After reviewing the declarations provided me by Mr. Fierro's current counsel, I am convinced the presentation of a mental health defense at trial would have been warranted. That is not falling on the sword. And the last thing I would like to read is a quote from Jennings. This is at page 1016, 290, Fed 3rd, 1006. We find that even in 1983, the information the trial counsel acknowledges he possessed would have put a reasonable attorney on notice that he needed to investigate mental health and drug-related issues more thoroughly when defending a client against a charge of first-degree capital murder, for which raising a reasonable doubt as to intent could be crucial. We also hold that the district court clearly erred in finding that Mr. Oliver made a tactical decision not to conduct any investigation into possible mental defenses. It is within the realm of possibility consistent with Hendricks that it would not have been ineffective to make a tactical decision to eschew a mental defense had Mr. Oliver performed a thorough investigation and consulted with his client. But Mr. Oliver did not make such an informed strategic choice. Because he settled on a very weak alibi defense before conducting any investigation that might have led to a reasoned tactical choice, Mr. Oliver was ineffective with the meaning of strickland. That's our case. Thank you. I'd like to thank both sides for your helpful arguments. Fioro v. Ducard submitted for decision, and we'll now take a ten-minute break before the last case. All rise.
judges: W. Fletcher, Ikuta, Barker